UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JORDAN ALUIZIO, | ) | CASE NO.: 4:23-cv-02399 |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| v. | ) | |
| | ) | |
| CORY VAN KANEGAN, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Before the Court is the Motion for Summary Judgment (Doc. 24) filed by Defendant Cory Van Kanegan ("Defendant" or "Van Kanegan"). Plaintiff Jordan Aulizio ("Plaintiff" or "Aulizio")[1] responded in opposition (Doc. 26), and Defendant replied (Doc. 28). For the reasons stated herein, Defendant's Motion for Summary Judgment is GRANTED.

I. BACKGROUND

A. Statement of Facts

On July 7, 2023, around 4:00 PM, emergency personnel were dispatched to a Dollar General in Kinsman Township because Aulizio was reportedly "about to pass out" in the store. (Doc. 24-1 at 231-32.)[2]

At his deposition, Aulizio admitted he drove himself to the Dollar General. (Doc. 21, Aulizio Depo., at 133.) He did not recall passing out. (*Id.*) He gave his keys to a store

---

[1] Although the case caption lists Plaintiff's last name as "Aluizio," the correct spelling appears to be "Aulizio." (*See* Docs. 26, 29.)

[2] For ease and consistency, record citations are to the electronically stamped CM/ECF document and PageID# rather than any internal pagination.

employee after they expressed concern about him driving. (*Id.* at 133-34.) Aulizio recalled an EMT asking him to leave the store because he was "scaring people." (*Id.* at 134.)

Van Kanegan, who was serving as the volunteer Fire Chief of Kinsman Township, received an EMS dispatch notification about a semiconscious male at the Dollar Store. (Doc. 24 at 215; Doc. 22, Van Kanegan Depo., at 189-90.) Van Kanegan was across the street at a yard sale when he received the call. (Doc. 22 at 190.) He knew Johnston Township paramedics were short staffed at the time, so he decided to assist. (*Id.* at 189-90.) When Van Kanegan arrived at the scene, he saw Aulizio in the Dollar General parking lot. (*Id.* at 190.) Johnston Township paramedic Sean Whitehouse ("Whitehouse") was already on the scene. (189.) Van Kanegan arrived at the same time as Kinsman Township Police Officer Ellwood-Bellas ("Ellwood-Bellas"). (*Id.*) From that point, the incident was captured by Ellwood-Bellas's body camera. (Doc. 25, Body Camera.)[3]

The body camera video begins with Ellwood-Bellas asking Aulizio, "What's wrong?" (Doc. 25 at 12:37:44.) The beginning of Aulizio's response is unintelligible, but he later states his ride left him. (*Id.* at 12:37:46-49.) Aulizio tells Ellwood-Bellas he is going to leave his car "until they bring my key." (*Id.* at 12:38:00.) Ellwood-Bellas asks if Aulizio passed out, to which Aulizio responds he was "in the ICU." (*Id.* at 12:38:04.) Aulizio then says in the direction of Van Kanegan and Whitehouse, who are off camera, "I didn't overdose in jail." (*Id.* at 12:38:13.) Van Kanegan states, "That's not what I was told," and asks whether Aulizio was in jail because he overdosed. (*Id.* at 12:38:14-21.) When Aulizio explains he already got sentenced for a DUI, Van Kanegan responds, "We all know that. We see you all the fucking time. You

---

[3] Although the incident occurred around 4:00 PM, the body camera timestamp begins at 12:37:44. (Doc. 25.) All references to the body camera herein will use the timestamp on the video.

know that as well as I do . . . so you're going to sit here and tell me you're not now?" (*Id.* at 12:38:25-32.) Aulizio questions, "What, overdosing?" (*Id.* 12:38:33.) Van Kanegan continues to push back on whether Aulizio has ever overdosed, and Aulizio's response is not coherent. (*Id.* at 12:38:34-12:38:41.) Van Kanegan eventually states, "I know that both of us standing here have pushed Narcan on you before, so you can lie all you want." (*Id.* at 12:38:42-45.) Ellwood-Bellas and Van Kanegan are heard asking Aulizio how he got there. (*Id.* at 12:38:48-50.) Aulizio is adamant he did not drive to the Dollar General as he walks toward his own car in the parking lot. (*Id.* at 12:38:51.)

Whitehouse then engages with Aulizio. (*Id.* at 12:39:00.) Whitehouse tells Aulizio he has two ambulances coming from Cortland for him because Aulizio went into the Dollar General and was passing out. (*Id.* at 12:39:05-14.) Whitehouse tells Aulizio, "Your pupils are pinpoint." (*Id.* at 12:39:14-15.) Aulizio states he just got out of the ICU, and Van Kanegan remarks, "Getting out of the ICU has nothing to do with your pinpoint pupils." (*Id.* at 12:39:18-24.)

Aulizio walks away from Whitehouse and Van Kanegan to retrieve something from his car, and then attempts to walk away from the scene to wait for his ride elsewhere. (*Id.* at 12:39:28-40.) Ellwood-Bellas tells Aulizio to "wait over here" and that the paramedics "are leaving." (*Id.* at 12:39:44-49.) Aulizio walks back toward the Dollar General. (*Id.*) Ellwood-Bellas asks him again how he got there. (*Id.* at 12:39:53.) Aulizio says a friend took him up there, but his response trails off. (*Id.* at 12:39:57-12:40:03.) Ellwood-Bellas directs Aulizio to sit on the curb. (*Id.* at 12:40:04.) Aulizio insists his friend lives nearby and says he will just walk home. (*Id.* at 12:40:12-16.) Ellwood-Bellas responds, "You're not walking anywhere . . . you're in no condition to walk right now, Jordan." (*Id.* at 12:40:16-21). When Aulizio questions

him, Ellwood-Bellas explains, "because your pimples are like that big," referring to Aulizio's pupils.  (*Id.* at 12:40:21-26).

At this point, Ellwood-Bellas can be heard communicating over the radio.  (*Id.* at 12:40:29-57.)  Ellwood-Bellas confirms Aulizio has an outstanding warrant for a probation violation on a DUI.  (*Id.*)  Aulizio is walking away from the scene.  (*Id.* at 12:40:57.)  Ellwood-Bellas tells Whitehouse and Van Kanegan that Aulizio has a warrant and says, "let's go."  (*Id.* at 12:40:59-41:01.)

Ellwood-Bellas and Van Kanegan pursue Aulizio on foot as Aulizio runs away.  (*Id.* at 12:41:02-15.)  Ellwood-Bellas brings Aulizio to the ground and Van Kanegan assists with handcuffing.  (*Id.* at 12:41:17-12:42:02.)  Aulizio is resistant.  (*Id.*)  Van Kanegan can be heard mentioning Narcan.  (*Id.* at 12:42:01.)  Once handcuffed, Aulizio is walked back to the Dollar General parking lot.  (*Id.* at 12:42:07-57.)

Back in the Dollar General parking lot, Aulizio insists he is just dehydrated and that those on the scene do not know his situation.  (*Id.* at 12:43:00-22.)  Van Kanegan retorts everyone knows his situation.  (*Id.* at 12:43:22-27.)  Whitehouse can be seen entering the frame and mentions Narcan.  (*Id.* at 12:43:34.)  Aulizio asks, "Narcan me, for fucking what?"  (*Id.* at 12:43:34-36.)  Van Kanegan responds, "Because you're fucking high."  (*Id.* at 12:43:37.)  Aulizio denies he is high and states he is not getting "Narcaned."  (*Id.* at 12:43:37-46.)  Aulizio argues they cannot just Narcan someone who is fine.  (*Id.* at 12:43:53-57.)  Van Kanegan responds, "You're not fine."  (*Id.* at 12:43:58.)

Ellwood-Bellas places Aulizio against the hood of the police vehicle.  (*Id.* at 12:44.)  With Van Kanegan helping hold Aulizio against the vehicle, Whitehouse unsuccessfully attempts to administer Narcan to Aulizio.  (*Id.* at 12:44:01-10.)  Aulizio exclaims he is resisting the

Narcan.  (*Id.* at 12:44:09.)  Whitehouse and Van Kanegan bring Aulizio to the ground.  (*Id.* at 12:44:20.)  Whitehouse retrieves the vial of Narcan from the hood of the police vehicle.  (*Id.* at 12:44:34.)  Aulizio continues resisting the administration of Narcan and kicks Ellwood-Bellas.  (*Id.* at 12:44:40-45.)  Van Kanegan can be seen helping hold Aulizio on the ground.  (*Id.* at 12:44:41-56.)  Van Kanegan can be heard saying "push this fucking Narcan."  (*Id.* at 12:44:57.)

Aulizio is still being held on the ground while Van Kanegan and Whitehouse are on either side of him.  (*Id.* at 12:44:50-12:45:20.)  Van Kanegan asks if Aulizio blew his nose on him and slaps Aulizio in response.  (*Id.* at 12:45:22-26.)  Whitehouse's gloved hand can be seen placing the vial of Narcan onto the ground next to Aulizio.  (*Id.* at 12:45:33.)  Ellwood-Bellas confirms over the radio EMS administered Narcan.  (*Id.* at 12:45:54-46:06.)

Another medical responder on the scene then asks Aulizio what he took.  (*Id.* at 12:46:20.)  Aulizio denies taking anything and reiterates he just got out of the ICU for being dehydrated.  (*Id.* at 12:46:20-32.)  Van Kanegan can be heard stating "pinpoint pupils don't come from dehydration."  (*Id.* at 12:46:32-34.)  Van Kanegan adds, "Your pupils are almost gone."  (*Id.* at 12:46:38.)  Aulizio insists he cannot be "Narcaned" while he is awake.  (*Id.* at 12:47:17-20.)  Someone on the scene replies, "you weren't awake in the store."  (*Id.* at 12:47:23.)  Aulizio continues to go back and forth with emergency personnel on the scene.  (*Id.* at 12:47:23-12:50.)  Ellwood-Bellas communicates over the radio that Aulizio is high and asks if the jail will take him because EMS is refusing to transport him.  (*Id.* at 12:50:50-55.)  Eventually Aulizio is placed in an ambulance to be transported to the hospital.  (*Id.* at 12:55:50.)

Aulizio testified that on the day of the incident, he had just gotten out of the hospital for dehydration.  (Doc. 21 at 122.)  He was serving a 10-day jail sentence for OVI when he was sent to the hospital.  (*Id.*)  He went home from the hospital with two days left on his sentence.  (*Id.*)

Aulizio admitted that prior to the incident, he had been seeing a counselor for addiction help and recovery for an addiction to prescription opiates. (*Id.* at 127.) Aulizio and Van Kanegan did know each other prior to the incident because they went to school together from elementary school to ninth grade. (*Id.* at 124; *see also* Doc. 22 at 188.)

Aulizio acknowledged during the incident people on the scene made various references to his pinpoint pupils, which can be caused by opiate use. (Doc. 121 at 134, 137.) Aulizio agreed the video does not show Van Kanegan administering the Narcan. (*Id.* at 140.) He denied ingesting opiates that day. (*Id.* at 134.) Aulizio went to the hospital after receiving Narcan, but there was "nothing" medically wrong with him. (*Id.* at 122-23.) As a result of the incident, Aulizio pled guilty to resisting and obstruction and served almost two months in jail. (*Id.* at 122.) When asked in written discovery, Aulizio stated he had no economic loss because of the incident and had no records of any resulting medical treatment. (*Id.* at 128-29; Doc. 21-1 at 156.)

Van Kanegan testified Whitehouse was the paramedic in charge during the incident. (Doc. 22 at 191.) Van Kanegan conferred with Whitehouse, who believed it was appropriate to administer Narcan to Aulizio. (*Id.*) Van Kanegan agreed. (*Id.* at 191-92.) He observed Aulizio staggering, slurring, not completing sentences, confused how he got to the store, and had an agitated demeanor. (*Id.* at 190-92, 194-96.) Van Kanegan and others also saw Aulizio's pinpoint pupils, which is a classic sign of narcotic use. (*Id.* at 190-92, 195-96.) Van Kanegan admitted Aulizio was not showing signs of respiratory depression, but asserted there are multiple occasions to administer Narcan even when a person is conscious. (*Id.* at 192-93.) Van Kanegan and Whitehouse were leaving before Aulizio ran from the scene and was arrested. (*Id.* at 197-98.)

Van Kanegan did not administer the Narcan. (*Id.* at 192.) He knew Aulizio did not want the Narcan. (*Id.* at 192, 199.) Van Kanegan helped Whitehouse administer the Narcan by restraining Aulizio. (*Id.* at 189, 192.) Van Kanegan asserted Narcan is not designed to harm the patient, and he was not trying to harm Aulizio. (*Id.* at 200.)

### B. Procedural History

On December 18, 2023, Aulizio commenced this action against Van Kanegan. (Doc. 1.) Aulizio alleges one count for violation of constitutional rights, in which he references bodily integrity and excessive force in violation of the Fourteenth Amendment. (*Id.* at ¶¶ 12-15.) He also alleges state law claims for assault and battery and intentional infliction of emotional harm. (*Id.* at ¶¶ 16-21.)

On November 27, 2024, Van Kanegan moved for summary judgment. (Doc. 24.) Defendant asserts qualified immunity on the § 1983 claims and statutory immunity on the state law claims. (*See id.*) On December 27, 2024, Aulizio responded in opposition. (Doc. 26.) He asserts Van Kanegan is not entitled to qualified immunity or state law immunity. (*Id.* at 259-67.) The motion is fully briefed. (Doc. 28.)

The Court will address the parties' arguments in turn.

## II. LAW AND ANALYSIS

### A. Standard of Review

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The moving party bears the burden of showing that no

genuine issues of material fact exist." *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021) (citations and quotations omitted). A "material" fact is one that "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[A] genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849-50 (6th Cir. 2020) (citations and quotations omitted).

"Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." *Queen v. City of Bowling Green, Ky.*, 956 F.3d 893, 898 (6th Cir. 2020) (quotation and citations omitted). On summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005). A party asserting or disputing a fact must cite evidence in the record or show the record establishes either the absence or the presence of a genuine dispute. *See* Fed. R. Civ. P. 56(c), (e). Rule 56 further provides "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(3); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.") (citations omitted).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotations and citations omitted). The Court's role is not to make credibility determinations or "weigh" conflicting evidence. *Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014). "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury,

or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Id.*

### B. Qualified Immunity

Van Kanegan argues he is entitled to qualified immunity because Aulizio cannot establish a violation of any clearly established constitutional right. (Doc. 24 at 221.) In response, Aulizio clarifies "he is only pursuing a violation of his substantive due process right to bodily integrity" for the forced administration of Narcan.[4] (Doc. 26 at 253; *see also id.* at 252, 264.)

"The doctrine of qualified immunity provides that 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 738 (6th Cir. 2022) (quoting *Williams*, 9 F.4th at 430).

Once asserted by a defendant, a "[p]laintiff bears the burden of showing that defendants are not entitled to qualified immunity." *Maben v. Thelen*, 887 F.3d 252, 269 (6th Cir. 2018) (citing *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009)); *see also Palma v. Johns*, 27 F.4th 419, 427 (6th Cir. 2022). The plaintiff must demonstrate both the challenged conduct violated a constitutional right and the right was clearly established. *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014). "If the plaintiff fails to establish either element, the defendant is immune from suit." *Id.*; *see also Barber v. Miller*, 809 F.3d 840, 844 (6th Cir. 2015) ("Once a defendant invokes qualified immunity, the plaintiff bears the burden of showing that (1) the defendant's acts violated a constitutional right and (2) the right at issue was clearly established at the time of the defendant's alleged misconduct."). "Between these two considerations, [the

---

[4] Aulizio "is no longer pursuing an excessive force claim." (Doc. 26 at 264.)

Court] may take them in either order.  *Hall v. Navarre*, 118 F.4th 749, 759 (6th Cir. 2024) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

To overcome Van Kanegan's qualified immunity defense, Aulizio must establish, in viewing the evidence in a light most favorable to Aulizio, (1) Van Kanegan violated Aulizio's substantive due process right to bodily integrity, and (2) governing caselaw clearly established the violation.  *See Lawler ex rel. Lawler v. Hardeman County*, 93 F.4th 919, 925 (6th Cir. 2024).

The Court's analysis begins and ends with the constitutional violation prong.

### 1.     Deprivation of a Liberty Interest

Aulizio asserts under the Fourteenth Amendment, "the introduction of Narcan into his system without his consent" violated his substantive due process rights.  (*See* Doc. 26 at 255.) Both the Supreme Court and Sixth Circuit have ruled forced medication for non-consenting individuals violates the substantive due process right of bodily integrity, Aulizio urges.  (*Id.* at 255-56.)  The video of the incident shows Narcan was administered to Aulizio while Van Kanegan restrained him, and he made it clear he did not consent to receiving the Narcan.  (*Id.* at 257, 260; Doc. 25.)  To Aulizio, this is conclusive evidence of a violation of his bodily integrity.

The right to bodily integrity is a fundamental substantive due process right.  *See Guertin v. State*, 912 F.3d 907, 918-19 (6th Cir. 2019).  "[A] government actor violates individuals' right to bodily integrity by knowingly and intentionally introducing life-threatening substances into individuals without their consent, especially when such substances have zero therapeutic benefit."  *Guertin*, 912 F.3d at 921 (citations and quotations omitted).  The Sixth Circuit has recognized "'the central tenet of the Supreme Court's vast bodily integrity jurisprudence is balancing an individual's common law right to informed consent with tenable state interests . . . .'"  *Mitchell v. City of Benton Harbor, Mich.*, 137 F.4th 420, 430-31 (6th Cir. 2025)

(quoting *Guertin*, 912 F.3d at 919). "'[I]ndividuals possess a constitutional right to be free from forcible intrusions on their bodies against their will, absent a compelling state interest.'" *Guertin*, 912 F.3d at 919 (quoting *Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490, 506 (6th Cir. 2012)); *see also Washington v. Harper*, 494 U.S. 210 (1990) (forcible injection of medication with serious side effects into a nonconsenting person's body requires a legitimate state interest); *Cruzan ex rel. Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 269, 278-81 (1990) ("This notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment," but state also has interest in life and informed consent). This includes the ability to refuse medical treatment. *See Capen v. Saginaw Cnty., Mich.*, 103 F.4th 457, 463 (6th Cir. 2024) (citing *Cruzan*, 497 U.S. at 278). But the right to bodily integrity is not absolute. *See Guertin*, 912 F.3d at 919, 934; *see also Harper*, 494 U.S. at 225-27, 236 (involuntary medication of inmate does not violate due process where inmate is dangerous to himself and others and the treatment is in inmate's medical interest); *United States v. Green*, 532 F.3d 538, 544 n.4 (6th Cir. 2008).

### 2. Conscience-Shocking Conduct

"Upon a showing of a deprivation of a constitutionally protected liberty interest, a plaintiff must show how the government's discretionary conduct that deprived that interest was constitutionally repugnant." *Guertin*, 912 F.3d at 922 (citing *Am. Express Travel Related Servs. Co. v. Kentucky*, 641 F.3d 685, 688 (6th Cir. 2011)). Violations of bodily integrity are constitutionally repugnant when they shock the conscience. *Guertin*, 912 F.3d at 922 (citing *Lillard v. Shelby Cnty. Bd. of Educ.*, 76 F.3d 176, 725 (6th Cir. 1996)). Aulizio must show (a) a deprivation of a liberty interest and (b) conscience-shocking conduct. *Id.* (quotations and

citations omitted); *see also Siefert v. Hamilton Cnty.*, 951 F.3d 753, 765-66 (6th Cir. 2020) (clarifying the substantive due process analysis is a two-part inquiry).

Aulizio has shown a deprivation of his right to bodily integrity, which is protected by the Fourteenth Amendment. *See Guertin*, 912 F.3d at 918-19. But he has failed to meet his burden to show Van Kanegan's conduct "shocks the conscience." *Id.* at 922.

"Conscience-shocking" behavior is more than mere negligence. *Siefert*, 915 F.3d at 766. It must be conduct "so 'brutal' and 'offensive' that [it does] not comport with traditional ideas of fair play and decency" or civilized conduct. *Range v. Douglas*, 763 F.3d 573, 589-90 (6th Cir. 2014) (quoting *Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998)); *see also Guertin*, 912 F.3d at 923. To prevent "transforming run-of-the-mill tort claims into constitutional" violations, only the most egregious official conduct qualifies as conscience-shocking. *See Guertin*, 912 F.3d at 923; *Novak v. Federspiel*, 140 F.4th 815, 822-23 (6th Cir. 2025). "[U]njustifiable and intentionally injurious conduct" is usually conscience-shocking. *Mitchell*, 137 F.4th at 430.

When conduct falls somewhere between negligence and intentionally injurious, courts "evaluate the conduct in context to determine if the official was deliberately indifferent to a known risk of harm . . . ." *Id.* Considerations include "'the time for deliberation, the nature of the relationship between the government and the plaintiff, and whether a legitimate government purpose motivated the official's act.'" *Id.* at 431 (quoting *Guertin*, 912 F.3d at 924). The Court must find the governmental actor chose to act despite a subjective awareness of substantial risk of serious injury, and that he did not act in furtherance of a governmental purpose that justified taking that risk. *Guertin*, 912 F.3d at 924 (citations and quotations omitted).

Aulizio did not address these considerations. (*See* Doc. 26.) Aulizio maintains Van Kanegan has failed to demonstrate a compelling state interest. (Doc. 26 at 266.) But it is

Aulizio's burden to show Van Kanegan's conduct shocks the conscience.  *Guertin*, 912 F.3d at 922-23; *Barber*, 809 F.3d at 844.

Aulizio asserts the body camera footage shows "Aulizio was ambulatory, alert, oriented to name, date, and place, and showed no signs of respiratory depression." (Doc. 26 at 258.) To Aulizio, these facts show there was no compelling state interest in administering the Narcan against his wishes. (*See* Doc. 26 at 257-58, 264-66.) To the extent Aulizio relies on the proposed expert report to prove there was no compelling state interest to administer Narcan, the Court cannot consider the report. (*See* Doc. 26 at 258; Doc. 26-1.) Van Kanegan argues Aulizio's expert report violates Federal Rule of Evidence 704 by offering legal conclusions. (Doc. 28 at 282-83.)

Setting aside the Rule 704 challenge, the Court finds the report fails to meet the disclosure requirements of Federal Rule of Civil Procedure 26(a)(2)(B). The report does not provide the witness's qualifications; a list of all other cases in which the witness testified as an expert; or a statement of compensation. Fed. R. Civ. P. 26(a)(2)(B)(iv)-(vi). Rule 37(c)(1) mandates the exclusion of this report. *See Baker v. Blackhawk Mining, LLC*, 141 F.4th 760, 771-73 (6th Cir. 2025); *R.C. Olmstead, Inc. v. CU Interface, LLC*, 657 F. Supp. 2d 905, 908-14 (N.D. Ohio 2008).

Even when viewed in the light most favorable to Aulizio, the record before the Court demonstrates Van Kanegan and other first responders on the scene reasonably believed giving Narcan to Aulizio was necessary. Prior to the July 7 incident, Aulizio sought help for an addiction to prescription opiates. (Doc. 21 at 127.) On the day of the incident, Aulizio drove himself to the Dollar General. (*Id.* at 133.) He gave his keys to a store employee after they expressed concern about him driving. (*Id.* at 133-34.) An EMT asked Aulizio to leave the store

because he was "scaring people." (*Id.* at 134.)  He was released from the hospital while he was serving a jail sentence for OVI.  (*Id.* at 122.)

The body camera footage depicts the following events.  Emergency personnel are responding to reports that Aulizio was about to pass out in the Dollar General.  (Doc. 25 at 12:38:04, 12:39:05-14, 12:47:23; Doc. 22 at 189-90.)  He was confused as to how he got there, he had trouble completing responses to questions posed to him, and he was agitated.  (Doc. 25 at 12:37:46-49, 12:38:00-51, 12:39:53-12:40:03.)  And there are several references to Aulizio's pinpoint pupils from Van Kanegan, Whitehouse, and Ellwood-Bellas.  (*Id.* at 12:39:14-24, 12:40:21-26, 12:46:20-38.)  Pinpoint pupils are a sign of opioid use.  (Doc. 21 at 134, 137; Doc. 22 at 190-92, 195-96.)  Throughout the incident, Van Kanegan accuses Aulizio of overdosing or being high.  (Doc. 25 at 12:38:13-45, 12:39:18-24, 12:43:22-27, 12:43:37-58, 12:46:32-38.)  Whitehouse and Van Kanegan were preparing to leave the scene before Ellwood-Bellas learned about Aulizio's warrant.  (Doc. 22 at 197-98.)  Whitehouse administered the Narcan, with Van Kanegan's assistance, after Aulizio was arrested.  (*Id.* at 189, 192, 199; Doc. 21 at 140; Doc. 25 at 12:44:20-12:45:33.)  He was taken to the hospital but there was nothing medically wrong with him after he received the Narcan.  (Doc. 21 at 122-23.)

Van Kanegan testified Whitehouse was the paramedic in charge, and he agreed with Whitehouse's determination that Narcan was appropriate.  (Doc. 22 at 191-92.)  Although Aulizio was not showing signs of respiratory depression, Van Kanegan believed Narcan was necessary.  (*Id.* at 192-93.)  Van Kanegan observed Aulizio not completing sentences, he was confused how he got to Dollar General, had an agitated demeanor, and had pinpoint pupils.  (*Id.* at 190-92, 194-96.)  As discussed above, Van Kanegan's testimony is supported by the body camera footage.  To the extent Van Kanegan relies on the Whitehouse's Prehospital Care Report

to corroborate emergency personnel's assessment of Aulizio, the Court cannot consider it. (*See* Doc. 24 at 224-25; Doc. 28 at 283.) The excerpt of the prehospital report in Van Kanegan's brief purportedly comes from Exhibit B. (*See* Doc. 24 at 224-25; Doc. 24-2.) But the only version of Exhibit B before the Court is redacted, without any justification. (*Id.*) Nonetheless, as described above, the video shows Van Kanegan and others on the scene thought Aulizio was experiencing and opioid overdose, and they reasonably believed administering Narcan was necessary.

Van Kanegan argues Aulizio's arrest meant Aulizio no longer had the freedom to act on his own behalf or consent to medical treatment. (Doc. 24 at 223-25; Doc. 28 at 278-82.) Van Kanegan cites to *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-20- (1989), and Sixth Circuit caselaw for the proposition that emergency personnel are obligated to provide adequate medical care to pretrial detainees. (Doc. 24 at 223-25; Doc. 28 at 281-82.) To Van Kanegan, once Aulizio was arrested, his consent to medical treatment was unnecessary because first responders were solely responsible for his care. (*Id.*)

While the Fourteenth Amendment imposes an affirmative duty to provide adequate medical care to pretrial detainees, the Court is not persuaded a pretrial detainee is deprived of his ability to consent to medication simply because he is arrested, as Van Kanegan suggests. *See Jackson v. Schultz*, 429 F.3d 586, 590 (6th Cir. 2005) (citing *DeShaney*, 489 U.S. at 200). But Aulizio's arrest, the first responders' duty to provide him adequate medical care as a pretrial detainee, and that first responders reasonably believed Narcan was necessary to reverse a suspected opioid overdose are relevant to the Court's shocks-the-conscience considerations. *See Mitchell*, 103 F.4th at 431; *Guertin*, 912 F.3d at 924. Aulizio did not address these considerations. (*See* Doc. 26.) He also did not establish Van Kanegan acted with deliberate

indifference in providing medical care or disregarded a substantial risk of serious harm. (*See* Doc. 28 at 284.)

The record evidence shows Van Kanegan had a compelling state interest to assist in the administration of Narcan, even without Aulizio's consent. Once Aulizio was arrested, first responders owed him a duty of adequate medical care. Van Kanegan and others on the scene observed Aulizio to be experiencing an opioid overdose. (Doc. 22 at 190-92, 194-96; Doc. 25 at 12:38:13-45, 12:39:14-24, 12:40:21-26, 12:43:22-58, 12:46:20-38.) Whitehouse and Van Kanegan determined administering Narcan was in his medical interest. (Doc. 22 at 190-92.) Van Kanegan helped restrain Aulizio while Whitehouse administered the Narcan. (Doc. 21 at 140; Doc. 22 at 189, 192, 199; Doc. 25 at 12:44:20-12:45:33.) Even if Narcan was not medically necessary, there was no known risk of harm, and Van Kanegan did not intend to harm to Aulizio. (Doc. 22 at 200.) And Aulizio acknowledges the Narcan did him no harm. (Doc. 21 at 122-23, 128-29; Doc. 21-1 at 156.)

Van Kanegan and others did not knowingly and intentionally introduce a life-threatening substance into Aulizio that had zero therapeutic benefit. *See Guertin*, 912 F.3d at 921. They did the opposite—they introduced a potentially lifesaving substance that had zero harmful side effects. Aulizio has not met his burden to show Van Kanegan chose to act despite a subjective awareness of substantial risk of serious injury. He also failed to show Van Kanegan's conduct lacked a legitimate governmental purpose. In viewing the evidence in the light most favorable to Aulizio, no jury could find that restraining Aulizio so another paramedic could give him a potentially lifesaving medication, with no harmful side effects, is conscience-shocking conduct.

Because Aulizio has not met his burden to establish a constitutional violation, the Court need not consider whether the right was clearly established.  The Court finds Van Kanegan is entitled to qualified immunity on Aulizio's Fourteenth Amendment claim.

### C. State Law Immunity

As to Aulizio's state law claims, Van Kanegan asserts he is entitled to statutory immunity under Ohio Rev. Code. §§ 2744.03(A)(6) and 4765.49(A).  (Doc. 24 at 227-28; Doc. 28 at 285-86.)  Section 3715.504(A) explicitly authorizes administering overdose reversal drugs to an individual "apparently experiencing an opioid-related overdose," Van Kanegan urges.  (*Id.*)

Under § 2744.03(A)(6), an employee is immune from liability unless (a) the employee acted outside the scope of his employment or official responsibilities; (b) the employee acted with malicious purpose, in bad faith, wantonly, or recklessly; or (c) the Revised Code expressly imposes liability on the employee.  Under § 4765.49(A), a first responder is not liable for damages in a civil action from his administration of emergency medical services, unless the services are administered in a manner constituting willful or wanton misconduct.

Aulizio argues Van Kanegan does not have immunity from his state law claims pursuant to § 2744.03(A)(6)(b).  (Doc. 26 at 266-67.)  But it is not clear which, if any, of his state law claims he is still pursing.  (*See id.* at 252, ("Issues Presented"); *id.* at 253 ("At the outset, Aulizio states that he is only pursuing a violation of his substantive due process right to bodily integrity claim in this lawsuit.").)

To Aulizio, because Van Kanegan violated his substantive due process rights, Van Kanegan breached a known duty as an EMT.  (*Id.* at 266-67.)  By breaching a known duty, Van Kanegan therefore acted willfully and in bad faith, Aulizio urges.  (*Id.* at 266-67.)  Without citations to the record, Aulizio further asserts the record supports Van Kanegan acted willfully

and in bad faith. (*Id.* at 267.) But as discussed above, Aulizio has not shown Van Kanegan violated his substantive due process rights. And he has not shown Van Kanegan acted willfully or in bad faith by helping Whitehouse administer Narcan, which they believed was medically necessary. Thus, Van Kanegan is entitled to statutory immunity on Aulizio's state law claims.

### III. CONCLUSION

For the reasons stated herein, Defendant Corey Van Kanegan's Motion for Summary Judgment (Doc. 24) is GRANTED.

**IT IS SO ORDERED.**

**Date:** August 8, 2025

_____
BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE